**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SANDERS COUNTY REPUBLICAN
CENTRAL COMMITTEE,
            *Plaintiff-Appellant,*

                    v.

STEVEN BULLOCK, in his official
capacity as Attorney General for
the State of Montana; JAMES
MURRY, in his official capacity as
the Commissioner for Political
Practices for the State of Montana,
            *Defendants-Appellees.*

No. 12-35543

D.C. No.
CV-12-00046

OPINION

Appeal from the United States District Court
for the District of Montana
Charles C. Lovell, Senior U.S. District Judge, Presiding

Argued and Submitted
August 31, 2012—Seattle, Washington

Filed September 17, 2012

Before: Mary M. Schroeder and Ronald M. Gould,
Circuit Judges, and Jed S. Rakoff, Senior District Judge.*

Opinion by Judge Rakoff;
Dissent by Judge Schroeder

---

*The Honorable Jed S. Rakoff, Senior District Judge for the U.S. District Court for the Southern District of New York, sitting by designation.

**COUNSEL**

Matthew G. Monforton, Bozeman, Montana, for the plaintiff-appellant.

Steven Bullock, Montana Attorney General, Michael G. Black (argued) and Andrew I. Huff, Montana Assistant Attorneys General, Helena, Montana, for the defendants-appellees.

---

**OPINION**

RAKOFF, Senior District Judge:

Since 1935, Montana has selected its judges through non-partisan popular elections. Mont. Code Ann. § 13-14-111. Further to this end, Montana makes it a criminal offense for any political party to "endorse, contribute to, or make an expenditure to support or oppose a judicial candidate," Mont. Code Ann. § 13-35-231, and individuals who facilitate such activities may also be held criminally liable, Mont. Code Ann. § 13-35-105. The voters of Montana are thus deprived of the full and robust exchange of views to which, under our Constitution, they are entitled.

Appellant Sanders County Republican Central Committee ("the Committee") seeks to endorse judicial candidates and to enable the expenditures that would make those views publicly known. The Committee argues that Montana's ban on political party endorsements is an unconstitutional restriction of its First Amendment rights of free speech and association.[1] On May 29, 2012, the Committee filed suit against Montana's Commissioner of Political Practices James Murry and against Montana's Attorney General Steven Bullock seeking injunctive relief and a declaration that the statute is unconstitutional.

---

[1]Appellant does not here challenge Montana's ban on contributions to judicial candidates by political parties.

On June 26, 2012, the district court denied the Committee's motion for a preliminary injunction. The Committee appeals that decision and seeks immediate injunctive relief to prevent Montana from enforcing the statute against the Committee and its members. We have jurisdiction under 28 U.S.C. § 1292(a)(1). For the following reasons, we reverse the district court and grant immediate injunctive relief.

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1115 (9th Cir. 2011) (quoting *Winter v. NRDC*, 555 U.S. 7, 24-25 (2008)). A denial of a preliminary injunction is generally reviewed for abuse of discretion. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). However, where a district court's denial of a preliminary injunction motion "rests solely on a premise of law and the facts are either established or undisputed, our review is *de novo*." *Sammartano v. First Judicial Dist. Ct.*, 303 F.3d 959, 964-65 (9th Cir. 2002). In the instant case, where the essential issues are matters of law, we review the district court's conclusions *de novo*.

## I.   LIKELIHOOD OF SUCCESS ON THE MERITS

### A.   Protected Speech

When seeking a preliminary injunction "in the First Amendment context, the moving party bears the initial burden of making a colorable claim that its First Amendment rights have been infringed, or are threatened with infringement, at which point the burden shifts to the government to justify the restriction." *Thalheimer*, 645 F.3d at 1116. Here, there can be no question that the Committee has carried its initial burden.

[1] As the Supreme Court has found, "[t]he First Amendment 'has its fullest and most urgent application to speech

uttered during a campaign for political office.' " *Citizens United v. Fed. Election Comm'n*, 130 S. Ct. 876, 898 (2010) (quoting *Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989)); *see also Buckley v. Valeo*, 424 U.S. 1, 48 (1976) ("Advocacy of the election or defeat of candidates for federal office is no less entitled to protection under the First Amendment than the discussion of political policy generally or advocacy of the passage or defeat of legislation."). Thus, political speech—including the endorsement of candidates for office—is at the core of speech protected by the First Amendment.

**[2]** This protection extends as much to political parties exercising their right of association as to individuals. As this Court stated in *Geary v. Renne*, "because the exercise of these basic first amendment freedoms traditionally has been through the media of political associations, political parties as well as party adherents enjoy rights of political expression and association." 911 F.2d 280, 283 (9th Cir. 1990) (en banc), *rev'd on other grounds, Renne v. Geary*, 501 U.S. 312 (1991). More recently, the Supreme Court, in extending First Amendment protection of political speech to corporations, reaffirmed that "[t]he Court has thus rejected the argument that political speech of corporations or other associations should be treated differently under the First Amendment simply because such associations are not 'natural persons.' " *Citizens United*, 130 S. Ct. at 900.[2]

**[3]** The threat to infringement of such First Amendment rights is at its greatest when, as here, the state employs its criminalizing powers. As the Supreme Court further found in

---

[2]In her dissent, our respected colleague seems to suggest that a political party has no independent First Amendment right to free speech beyond the rights of its constituent members. This position ignores the explicit recognition in *Citizens United* that associations have their own free speech rights, separate and independent from those of their members. *See Citizens United*, 130 S. Ct. at 904.

*Citizens United*, "[i]f the First Amendment has any force, it prohibits Congress from fining or jailing citizens, or associations of citizens, for simply engaging in political speech." 130 S. Ct. at 904. Thus, the Committee has clearly shown that section 13-35-231, on its face, restricts the Committee's exercise of its First Amendment rights.

## B. Strict Scrutiny

The burden therefore shifts to Montana to attempt to justify the restriction. *See Thalheimer*, 645 F.3d at 1116. As a preliminary matter, the Court must determine what standard it must apply to the assessment of such alleged justifications: "strict scrutiny" or "balancing." While the district court applied strict scrutiny, Montana argues that this Court should apply a balancing test that weighs against the Committee's First Amendment rights the state's Tenth Amendment right to structure its judicial institutions as it deems fit.

But while the Tenth Amendment preserves to the states the power to regulate the roles that political parties may play in the design of judicial and other institutions, that does not imply that the states have similar leeway in placing restrictions upon a political association's right to speak. *See Eu*, 489 U.S. at 222-24 ("A State's broad power to regulate the time, place, and manner of elections 'does not extinguish the State's responsibility to observe the limits established by the First Amendment rights of the State's citizens.' " (quoting *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 217 (1986))); *Geary*, 911 F.2d at 288 (Reinhardt, J., concurring) ("[T]here is all the difference in the world between refusing to delegate to political parties the decision as to which candidates appear on the general-election ballot and prohibiting political party organizations from announcing their views on the merits of candidates seeking public office.").

**[4]** Thus, we find that because the statute here at issue is, on its face, a content-based restriction on political speech and

association, and thereby threatens to abridge a fundamental right, it is "subject to strict scrutiny, which requires the Government to prove that the restriction 'furthers a compelling interest and is narrowly tailored to achieve that interest.' " *Citizens United*, 130 S. Ct. at 882 (quoting *Fed. Election Comm'n v. Wis. Right To Life, Inc.*, 551 U.S. 449, 464 (2007)); *see also Geary*, 911 F.2d at 283 (applying strict scrutiny in striking down California's ban on political party endorsements of candidates for nonpartisan office).[3]

## C.   Compelling Interest and Narrow Tailoring

**[5]** The district court found, and the parties do not here dispute, that Montana has a compelling interest in maintaining a fair and independent judiciary. Where Montana and the district court err, however, is in supposing that preventing political parties from endorsing judicial candidates is a necessary prerequisite to maintaining a fair and independent judiciary. *See United States v. Alvarez*, 132 S. Ct. 2537, 2549 (2012) ("The First Amendment requires that the Government's chosen restriction on the speech at issue be 'actually necessary' to achieve its interest."); *R.A.V. v. City of St. Paul*, 505 U.S. 377, 395 (1992) ("[T]he danger of censorship presented by a facially content-based statute requires that that weapon be employed only where it is *necessary* to serve the asserted compelling interest." (internal quotation marks and citations omitted)). Montana offers no evidence to support this facially doubtful proposition, and it flies in the face of the fact that many of the other 38 states that elect their judges not only allow party endorsements but require party nominations.[4] Nor

---

[3]For similar reasons we reject Montana's argument that a balancing test should be applied to weigh the competing constitutional concerns of Appellants' First Amendment rights of speech and association against potential litigants' due process interests in a fair and impartial judiciary.

[4]For a summary of which states require partisan elections, see Roy A. Schotland, *New Challenges to States' Judicial Selection*, 95 Geo. L.J. 1077, 1085 (2007).

does Montana suggest that, as a result, the judiciaries of these other states lack fairness or integrity. *See Republican Party of Minn. v. White*, 536 U.S. 765, 796 (2002) (Kennedy, J., concurring) ("Many [elected state judges], despite the difficulties imposed by the election system, have discovered in the law the enlightenment, instruction, and inspiration that make them independent-minded and faithful jurists of real integrity."). It may be, of course, that Montana reasonably believes that restricting political endorsements of judicial candidates enhances the independence of its judiciary; but such supposed "best practices" are not remotely sufficient to survive strict scrutiny.

Under a strict scrutiny standard, therefore, Montana lacks a compelling interest in forbidding political parties from endorsing judicial candidates. Moreover, even if it were otherwise, section 13-35-231 is not narrowly tailored to this end.

To begin with, the existence of content-neutral alternatives " 'undercut[s] significantly' any defense of such a statute." *R.A.V.*, 505 U.S. at 395 (quoting *Boos v. Barry*, 485 U.S. 312, 329 (1988)) (alteration in original). If Montana were concerned that party endorsements might undermine elected judges' independence, Montana could appoint its judges, with a bipartisan and expert panel making nominations—a less restrictive alternative currently practiced by several states.

This is not to say, obviously, that Montana's decision to elect its judges is impermissible.[5] But if Montana "chooses to

---

[5]We disagree with the dissent's suggestion that affording political parties their full First Amendment rights inevitably requires that judicial elections be treated no differently than elections for the political branches. Montana's decision to exclude parties from the nomination and balloting process for judicial candidates remains a valid choice to limit party involvement in judicial institutions. *See* Mont. Code Ann. § 13-14-111. Contrary to the dissent, we do not see how a political party, in the absence of a role in the nomination and balloting process, is materially different from any other interest group that is permitted under Montana law to endorse a judicial candidate.

tap the energy and the legitimizing power of the democratic process, it must accord the participants in that process . . . the First Amendment rights that attach to their roles." *White*, 536 U.S. at 788 (quoting *Renne*, 501 U.S. at 349 (Marshall, J., dissenting)) (alteration in original); *see also Renne*, 501 U.S. at 349 (Marshall, J., dissenting) ("[T]he prospect that voters might be persuaded by party endorsements is not a *corruption* of the democratic process; it *is* the democratic process."). To hold otherwise would turn "First Amendment jurisprudence on its head." *White*, 536 U.S. at 781.[6]

Furthermore, section 13-35-231, while not narrowly tailored to achieve its ends, is at the same time under-inclusive, in that it forbids judicial endorsements by political parties but not by other associations, individuals, corporations, special interest groups, and the like. As noted by the Eighth Circuit in *Republican Party of Minn. v. White* (*White II*),

> There are numerous other organizations whose purpose is to work at advancing any number of similar goals, often in a more determined way than a political party. Minnesota worries that a judicial candidate's consorting with a political party will damage that individual's impartiality or appearance of impartiality as a judge, apparently because she is seen as aligning herself with that party's policies or procedural goals. But that would be no less so when a judge as a judicial candidate aligns herself with the constitutional, legislative, public policy and procedural beliefs of organizations such as the National Rifle Association (NRA), the National Organization

---

[6]While, as the dissent notes, *White* concerned the unconstitutionality of limits on a judge's speech during a judicial election, nothing in the majority opinion in *White* suggests that laws limiting speech by parties differ from laws limiting speech by candidates. In both cases, the First Amendment requires strict scrutiny of such limitations, and for the reasons here explained the challenged statute criminalizing party political speech does not withstand strict scrutiny.

for Women (NOW), the Christian Coalition, the NAACP, the AFL-CIO, or any number of other political interest groups.

416 F.3d 738, 759 (8th Cir. 2005). Such under-inclusivity "diminish[es] the credibility of the government's rationale for restricting speech." *City of Ladue v. Gilleo*, 512 U.S. 43, 52 (1994).

**[6]** In short, Montana has shown neither that section 13-35-231 is necessary to achieve a compelling state interest nor that it is narrowly and rationally tailored to that purpose.

## II. IRREPARABLE HARM

**[7]** With judicial elections imminent in Montana, and the candidates already selected and announced, the need for immediate injunctive relief enjoining Montana from prohibiting and penalizing political parties' endorsements of judicial candidates is apparent. Nevertheless, the district court, in denying preliminary relief, pointed to the dearth of evidence before it and held that it ought not decide issues of such "fundamental and far-reaching import" without a complete record. True, the matter is of great importance, but as noted, the statute here is facially unconstitutional, and the burden then shifts to the state to try to justify the statute, either by evidence or argument, which, as shown above, it has failed to do. In such circumstances, and with the Committee's First Amendment rights being chilled daily, the need for immediate injunctive relief without further delay is, in fact, a direct corollary of the matter's great importance. Indeed, the fact that the Committee will otherwise suffer irreparable harm is demonstrated by "a long line of precedent establishing that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.' " *Thalheimer*, 645 F.3d at 1128 (quoting *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009)). When, as here, a party seeks to engage in political speech in an impending election, a

"delay of even a day or two may be intolerable." *Klein*, 584 F.3d at 1208 (citation omitted). We conclude that the Committee would suffer irreparable injury if a preliminary injunction were not granted.

## III.   BALANCE OF HARDSHIPS

Given the foregoing, it is patent that the hardships to the Committee from not issuing the injunction outweigh the cognizable hardship (if any) to the state from issuing the injunction. The Committee seeks to publicly endorse two judicial candidates in this year's election, and, if prohibited by law from doing so, its free speech rights will be lost forever. Nor is the harm from this ban on speech limited to the political parties it explicitly addresses. In *Alvarez*, Justice Breyer warned that "the threat of criminal prosecution . . . can inhibit the speaker from making [protected] statements, thereby 'chilling' a kind of speech that lies at the First Amendment's heart." 132 S. Ct. at 2553 (Breyer, J., concurring) (citing *Gertz v. Welch*, 418 U.S. 323, 340-341 (1974)). Here, the Committee's "members have often been afraid to even discuss at its meetings topics relating to judicial candidates so as to avoid even the appearance of endorsing any of them." Montana's threat of prosecution has thus had a "chilling" effect, radiating from the disfavored speaker to untargeted individuals and plainly protected speech.

**[8]** If Montana is preliminarily enjoined from enforcing the statute, it would suffer if there were any way to save the statute from being declared unconstitutional. But, as we have already shown, there is none, for the statute is unconstitutional on its face, and the state's proffered justifications, even if construed most favorably to the state, cannot survive strict scrutiny. Montana, in short, can derive no legally cognizable benefit from being permitted to further enforce an unconstitutional limit on political speech. *Cf. Allee v. Medrano*, 416 U.S. 802, 814 (1974) (upholding injunction preventing police harassment as doing no more than "requir[ing] the police to

abide by constitutional requirements"). Because we find that Montana's ban on party endorsements of judicial candidates offends the First Amendment, we conclude that the balance of hardships favors the Appellant.

## IV.  PUBLIC INTEREST

**[9]** The *Winter* test also asks us to consider the public interest. *See Winter*, 555 U.S. at 24. But here we view public interest factors as subsumed within our analysis of likelihood of success on the merits, irreparable injury, and balance of hardships. *See, e.g.*, *Klein*, 584 F.3d at 1207-08 (addressing irreparable injury, balance of hardships, and public interest elements in tandem). We conclude that the public interest here favors the requested injunction.

## V.  CONCLUSION

**[10]** For the foregoing reasons, we conclude that, because section 13-35-231 is unconstitutional on its face, Montana must be enjoined forthwith from enforcing it or otherwise interfering with a political party's right to endorse judicial candidates and to expend monies to publicize such endorsements. The mandate will issue forthwith, and the case is otherwise remitted to the district court for further proceedings consistent with this Opinion.

**REVERSED AND REMANDED.**

---

SCHROEDER, Circuit Judge, dissenting:

This decision is a big step backwards for the state of Montana, which we all agree has a compelling interest in maintaining an independent and impartial judiciary. The majority ignores the practical effects of its decision on that interest when it takes a formulaic approach to First Amendment doc-

trine. This is the first opinion to hold that even though a state has chosen a non-partisan judicial selection process, political parties have a right to endorse candidates. This means parties can work to secure judges' commitments to the parties' agendas in contravention of the non-partisan goal the state has chosen for its selection process.

The Supreme Court in *Republican Party of Minn. v. White* (*White I*), 536 U.S. 765 (2010) recognized that judges have a life beyond the bench and make statements throughout their legal careers on political and legal issues. "[J]udges often state their views on disputed legal issues outside the context of adjudication—in classes that they conduct, and in books and speeches." *Id.* at 778. Such activity differs from partisan endorsements. Judges' public discussion of their legal and political values therefore poses less of a threat to judicial open-mindedness than do endorsements by political parties.

Partisan endorsements do not protect the candidate's right to speak that was at the core of *White I*. Nor is endorsement necessary to protect the rights of the members and leaders of political parties to express judicial candidate preferences since they can lawfully endorse in their individual capacities.

This is thus an unwarranted extension of *White I*. This and other such extensions of *White I* lead to disruptions and distortions in the non-partisan processes states have developed in order to prevent judicial elections from turning on promises to decide cases in ways that will get votes. Thirty-nine states have judicial elections, and nearly all have enacted laws to treat judicial elections differently from political elections. American Judicature Society, Judicial Campaigns and Elections: Campaign Conduct, *available at* http://www.judicialselection.us/judicial_selection/campaigns_and_elections/campaign_conduct.cfm?state=. The Conference of Chief Justices has decried the trend toward eliminating these distinctions. Conference of Chief Justices, Declaration: Judi-

cial Elections are Different than Other Elections (2007), *available at* http://ccj.ncsc.dni.us/JudicialSelection Resolutions/DeclarationJudicialElections.html. The Conference's Declaration, quoting Chief Justice Roberts in his confirmation hearing, states, "[j]udges are not politicians. They cannot promise to do certain things in exchange for votes."

The Supreme Court in *White I* held only that the state violated the First Amendment when it prohibited "candidates for judicial election from announcing their views on disputed legal and political issues." 536 U.S. at 788. Today's decision extends this protection to political parties' endorsements in previously non-partisan elections. The result is to encourage a judiciary dependent upon political alliances. Political endorsements place judges in a position of indebtedness to "powerful and wide-reaching political organizations that can make or break them in each election cycle." *Republican Party of Minn. v. White (White II)*, 416 F.3d 738, 768 (8th Cir. 2005) (Gibson, J., dissenting). Partisan politics are particularly pernicious because parties serve as "natural bundling agents that coordinate sprawling political coalitions across all types of policy domains and venues." *See* Michael S. Kang & Joanna M. Sheperd, *The Partisan Price of Justice: An Empirical Analysis of Campaign Contributions and Judicial Decisionmaking,* 86 N.Y.U. L. Rev. 69, 107 (2011). Failing to recognize this, the majority and the Eighth Circuit in *White II* err in concluding that political parties are just another interest group. *See* 416 F.3d at 755.

Political endorsements, much more than judges' discussion of issues, lead to political indebtedness, which in turn has a corrosive impact on the public's perception of the judicial system. *See Wolfson v. Brammer*, 822 F. Supp. 2d 925, 931 (D. Ariz. 2011) ("Public confidence in the independence and impartiality of the judiciary is eroded if judges or candidates are perceived to be subject to political influence."); *Siefert v. Alexander,* 608 F.3d 974, 985-86 (7th Cir. 2010) ("Due process requires both fairness and the appearance of fairness in

the tribunal."); *see also Cox v. Louisiana*, 379 U.S. 559, 565 (1965) (upholding state statute prohibiting picketing outside a courthouse because of the state's interest in protecting "against the possibility of a conclusion by the public under these circumstances that the judge's action was in part a product of intimidation and did not flow only from the fair and orderly working of the judicial process"); *United States Civil Service Commission v. National Association of Letter Carriers*, 413 U.S. 548, 565 (1973) (upholding the Hatch Act's ban on partisan activity by federal civil servants because "it is not only important that the Government and its employees in fact avoid practicing political justice, but it is also critical that they appear to the public to be avoiding it . . . ."). Recognizing this, the Seventh Circuit has held that a ban on judges' endorsements of political candidates is not subject to strict scrutiny and is constitutional. *Siefert*, 608 F.3d at 986 ("While *White I* teaches us that a judge who takes no side on legal issues is not desirable, a judge who takes no part in political machinations is.").

The detrimental effects of the parties' ability to endorse in judicial elections is multiplied by their ability to engage in expenditures on behalf of or in opposition to judicial candidates. *See Citizens United v. Fed. Elec. Comm'n.,* 130 S. Ct. 876 (2010). The fact that political parties can back up their endorsements with significant sums of money threatens to further erode state judges' ability to act independently and impartially. *See* Brennan Center for Justice, The New Politics of Judicial Elections 2009-10 (2011), *available at* http://newpoliticsreport.org/site/wp-content/uploads/2011/10/JAS-NewPolitics2010-Online-Imaged.pdf.

In holding that Montana has a less restrictive means of structuring its judicial selection process, the majority fails to comprehend that this would take more than a simple tweak of the system. The majority presents judicial appointment as a less restrictive means of achieving the state's admittedly compelling interest in an impartial judiciary and one that does not

implicate the First Amendment. *See White I,* 536 U.S. at 788-92 (O'Connor, J., concurring). This alternative, however, is more theoretical than realistic. Despite dramatic changes in judicial election processes, states have been reluctant to shift to judicial appointments. *See* Roy A. Schotland, *New Challenges to States' Judicial Selection*, 95 Geo. L. J. 1077, 1081-82 (2007). As the American Judicature Society has noted, no state in the past decade, since the Court's decision in *White I,* has used its democratic process to shift away from judicial elections. *See* American Judicature Society, Chronology of Successful and Unsuccessful Merit Selection Ballot Measures, *available at* http://judicialselection.us/uploads/documents/Merit_selection_chronology_1C233B5DD2692 .pdf. "[A] generation of experience . . . makes it clear that elections will stay in many and perhaps all of the states that have that system." Conference of Chief Justices, *supra.* In sum, a shift away from judicial elections is not a realistic alternative in states that have chosen judicial elections.

Today's decision is another step in the unfortunate slide toward erasing the fundamental distinctions that states have created between their selection processes for judicial offices and political offices. These distinctions are foundational to states' abilities to maintain separation of powers between the branches of government. *White I,* 536 U.S. at 803-04 (Ginsburg, J., dissenting) ("Whether state or federal, elected or appointed, judges perform a function fundamentally different from that of the people's elected representatives. . . . The ability of the judiciary to discharge its unique role rests to a large degree on the manner in which judges are selected."). The Supreme Court's decision in *White I* was not intended to collapse these differences. The Court said, "[w]e neither assert nor imply that the First Amendment requires campaigns for judicial office to sound the same as those for legislative office." *Id.* at 783.

The inevitable impact of increasing partisanship, coupled with the potential for increasing volumes of monetary contri-

butions, serves only to erode the perceived and actual fairness of litigation in the state courts. These are the unfortunate and unforeseen consequences of the majority's unwarranted extension of *White I*, especially when viewed in the light of *Citizens United*.

In my view, the Republican Central Committee should not succeed on the merits of its argument that the ban on political parties' endorsements is unconstitutional. I therefore respectfully dissent and would affirm the denial of a preliminary injunction.